**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

Nov 20 2012, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of B.T., C.K., and D.K., minor children, and D.K., their mother, | ) ) ) ) | |
| D.K. (MOTHER), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 49A05-1202-JT-89 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gary Chavers, Judge Pro Tempore
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1103-JT-666, 49D09-1103-JT-667, and 49D09-1103-JT-668

**November 20, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

D.K. ("Mother") appeals the involuntary termination of her parental rights to her minor children, B.T., C.K., and D.K., challenging the sufficiency of the evidence supporting the juvenile court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of B.T., born in December 1999, C.K., born in November 2005, and D.K., born in July 2007.[1] The facts most favorable to the juvenile court's judgment reveal that, in August 2009, the Marion County office of the Indiana Department of Child Services ("DCS") removed the children from Mother's care when she was arrested for physical abuse of C.K. Based on that abuse, DCS alleged in a petition that the children were children in need of services ("CHINS"):[2]

> On or about August 20, 2009, the Department of Child Services (DCS) determined, by its Family Case Manager (FCM) Jason Jones, these children to be children in need of services because [Mother] has failed to provide the children with a safe, stable, and appropriate living environment. On or about August 18, 2009, [Mother] locked [C.K.] out of the apartment. [C.K.] reported that [Mother] also hit him on the head with a lock and hit his head on the wall. He further reported that [Mother] locked him in the bathroom and that his mouth and nose had been bleeding. FCM Jones observed the child to have numerous marks and bruises on his face and head. [Mother] admitted to slapping [C.K.] twice resulting in the child's head hitting the wall. [Mother] was arrested and incarcerated as a result of the incident. Due to the foregoing reasons, the coercive intervention of the Court is necessary to ensure the child's safety and well being.

---

[1] The parental rights of B.T.'s biological father, B.R., and C.K. and D.K.'s biological father, C.K., were also terminated in the order that is the subject of this appeal. Because the fathers do not participate in this appeal, we limit our recitation of the facts to those pertinent solely to Mother's appeal.

[2] B.T., C.K., and D.K.'s older sibling K.G. was also removed from Mother's care and named in the CHINS petition; however, K.G. was not a subject of the termination proceedings.

*Pet'r's Ex.* 1 at 2. Mother later admitted that the children were CHINS, and the juvenile court adjudicated them as CHINS.

In September 2009, Mother was convicted of Class D felony battery for the incident with C.K. The criminal court sentenced her to one and a half years, with 46 days executed and 499 days suspended to probation, and imposed a no-contact order between Mother and the children until September 2010. The court also ordered Mother to complete anger management and parenting classes as conditions of her probation.

In October 2009, the juvenile court issued a dispositional order formally removing the children from Mother's care and a participation decree ordering Mother to successfully complete a variety of tasks and services designed to improve her parenting skills and facilitate reunification with the children. Among other things, Mother was ordered to: (1) secure and maintain a legal and stable source of income; (2) obtain and maintain suitable housing; (3) complete a home-based counseling program and all resulting recommendations; (4) complete a parenting assessment and all resulting recommendations; (5) complete a drug and alcohol assessment and all resulting recommendations; and (6) comply with the conditions of her probation.

Mother successfully completed anger management, parenting, and drug and alcohol classes. However, she failed to complete home-based counseling and was discharged as unsuccessful by both home-based case manager Laura Bridwell ("Bridwell") and home-based therapist Suzanne Eller ("Eller").

From October 2009 to December 2010, Bridwell met with Mother on a weekly basis about obtaining housing and income so that she could be reunified with her

3

children. Mother had difficulty obtaining housing because of her prior evictions and felony conviction, and she stayed in at least four different places during that time period. As to income, Bridwell said that Mother applied for jobs but was unable to find employment. Because Mother made no progress in securing appropriate housing for her children or finding employment to provide for their basic needs, Bridwell closed out the referral as unsuccessful.

Eller received a home-based therapy referral to work with Mother in September 2011. Due to their lack of regular contact, Eller was never able to establish any goals for the counseling. They met twice. Their first contact occurred when Mother called to ask for help in finding a shelter because she had been staying with a friend but wanted to leave. Eller called numerous shelters and ultimately took Mother to Homeless Initiative Project. At their second meeting, Eller completed an intake assessment and planned to drive Mother to a court hearing and an appointment the following week. Mother never called to let her know where to pick her up. Eller tried calling Mother multiple times and contacted DCS, who tried to contact Mother by email. Eller also went to court on the day of the hearing, but Mother was not there. In October 2011, Eller closed out the home-based services due to lack of contact.

In addition to failing to complete home-based counseling, Mother never secured a stable source of income. Mother's last job was in 2008, before the CHINS proceedings were even initiated, and she stayed with that job for only a couple of months. Since then, she has relied on the support of family, friends, and a stipend from school.

4

Mother also failed to obtain suitable housing. The last time Mother had independent housing was at the start of the CHINS proceedings in August 2009. She has since stayed with friends and family and at shelters.

Mother told family case manager Karen Williams ("Williams") that she had found housing a couple of times, but Mother never followed up. In February 2010, she told Williams she could live at her sister-in-law's house rent-free, but as it was under renovation, Williams said it would not be suitable for the children until renovations were completed. Mother never told Williams whether the renovations were completed. Mother also told Williams about possible housing in Tennessee that Mother herself had never seen. Although she told Williams she would provide her with contact information, she never did.

In January 2011, Mother moved to Gary, Indiana, to look for housing but returned to Indianapolis in March 2011. In October 2011, she moved Atlanta, Georgia, and stayed with her sister. After a few weeks, she moved to a homeless shelter in Atlanta.

After the no-contact order ended in September 2010, Mother began visiting the children. By the end of 2010, however, the referral was cancelled because she had missed three consecutive visits. The children, who were in two different placements, visited each other at The Villages from January through June 2011. Mother saw them once at The Villages during this time period. When Mother's visits were reinstated in September 2011, she visited a few times at Children's Bureau. However, the referral was closed out due to two missed visits.

As to mental health, Mother was first diagnosed with bi-polar disorder when she was fifteen years old but did not receive treatment until she received the same diagnosis in 2008. She saw a therapist and took medication until she lost Medicaid coverage in October 2009. Williams was not comfortable recommending reunification if Mother did not follow through with mental health treatment. She referred Mother to a therapist at Midtown Mental Health, and Wishard Advantage covered the expenses. Mother told Williams that she was obtaining mental health treatment at Midtown. Instead, she saw the Midtown therapist only once and felt he brushed her off.

In March 2011, DCS filed a petition seeking the involuntary termination of Mother's parental rights. At the time of the evidentiary hearing in January 2012, which was over two years after the juvenile court entered the participation decree, Mother was still unemployed, her school stipend was not in place, she was living in the homeless shelter in Atlanta, and she had not seen the children since September 2011. She was not obtaining mental health treatment, but testified she would start a week after the hearing.

Evidence at the hearing established that the children were thriving in their current placement. Although B.T. had been in relative care, he joined C.K. and D.K. in their foster home in July 2011 when the relative requested a different placement. The children were bonded to each other and to their foster mother, whom they called their mom. B.T. and C.K. were getting straight As in school, and D.K. was in daycare. At the time of the hearing, the foster mother was ready to adopt C.K. and D.K., and while she had not yet decided whether she would also adopt B.T., B.T. was adoptable. Williams believed adoption was in the children's best interests because "[t]hey're in need of permanency.

6

[Mother] hasn't been able to provide housing or stable income . . . nor has she visited on a consistent basis." *Tr.* at 65. Guardian ad litem Andrea Manning was in agreement with the plan for adoption because the children were safe, happy, and in a stable environment.

After taking the matter under advisement, the juvenile court issued an order terminating Mother's parental rights. Mother now appeals.

## DISCUSSION AND DECISION

This Court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). Upon review of such a case, we do not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we set aside the judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, the juvenile court entered specific findings and conclusions in terminating Mother's parental rights. When reviewing findings and conclusions in a case involving the termination of parental rights, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v.*

7

*Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove four factors set forth in Indiana Code section 31-35-2-4(b)(2) (2010)[3] by clear and convincing evidence. Ind. Code § 31-37-14-2 (1997); *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009). The two factors challenged here are:

(B)    that one (1) of the following is true:

(i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

---

[3] We note that Indiana Code section 31-35-2-4 was recently amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition here and are, in any event, inapplicable to this case.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services; [and]

(C)     that termination is in the best interests of the child.

Ind. Code § 31-35-2-4(b)(2).

Mother challenges the sufficiency of the evidence supporting the juvenile court's determination that: (1) there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside her care will not be remedied; (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children; and (3) termination is in the children's best interests.

### I. Conditions Remedied

Indiana Code section 31-35-2-4(b)(2)(B) requires clear and convincing evidence of only one of its three circumstances. Here, the juvenile court determined that the first two circumstances had been established. Because we find it to be dispositive under the facts of this case, we discuss only whether there was a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside Mother's care would not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* Pursuant to

9

this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider any services offered by DCS to the parent and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* at 1252. DCS need not rule out all possibilities of change; rather, it must establish only a reasonable probability that the parent's behavior will not change. *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

In determining that there was a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside Mother's care would not be remedied, the juvenile court concluded:

> [Mother] has had twenty-seven months to remedy issues of instability and mental health. At the time of trial in this matter, [Mother] had no source of income and she resided in a shelter away from Indiana and her children. She still has not addressed her Bi-Polar Disorder which resulted in mood changes. Given the history of a lack of progress in addressing the issues standing in the way of reunification, it is not probable that she will address these issues in the future.

*Appellant's App.* at 36.

Mother challenges this conclusion, arguing that: (1) she applied for jobs and received support from family and a school stipend; (2) she consistently sought housing, but DCS failed to approve potential housing; and (3) mental health treatment was not required or needed.

10

The juvenile court's findings regarding income noted that Mother's last employment was in 2008. The court acknowledged that she "obtains funds from friends or relatives" but nonetheless found that she "never obtained . . . adequate income." *Id.* at 35. The court also noted Bridwell's testimony that when she closed out the referral after over a year, she "did not feel that [Mother] had the means to care for her children at that time." *Id.* The evidence supports these findings. Mother argues, however, that she applied for jobs and received support from family and a school stipend. We encourage Mother's search for employment, but we cannot ignore evidence that her last job was in 2008 and that she has not been employed since. Further, although Mother claimed she received support from family, friends, and a school stipend, there was no evidence that it was a stable source of income. Notably, the support she received from other people was apparently insufficient to keep her from living in a homeless shelter, and the school stipend was not even in place at the time of the evidentiary hearing.

The juvenile court also found that Mother "never obtained independent housing." *Id.* Specifically, the court noted that she "has resided with friends or relatives during the CHINS proceedings and is currently residing in a shelter." *Id.* Mother does not challenge these findings but argues that other evidence should have carried more weight. First, she argues that her felony conviction and prior evictions prevented her from finding independent housing, but that she nonetheless found housing with family, friends, and shelters. The evidence shows that Mother has consistently moved from place to place throughout these proceedings – from friends, family, and shelters, and from Indianapolis, to Gary, back to Indianapolis, and now Atlanta. Mother's continual movement from

11

place to place does not constitute suitable housing. Second, Mother blames Williams for never inspecting the places Mother believed were suitable for the children. This argument ignores the evidence that Mother never told Williams if renovations at her sister-in-law's house were completed and never provided her with any contact information for the potential housing in Tennessee.

As to mental health, the juvenile court found that Mother has bi-polar disorder and that DCS referred her to Midtown for therapy. The court also found that Mother "ha[d] not taken medication for over a year" and was not obtaining treatment from Midtown. *Id.* The evidence supports these findings. Mother, however, argues that mental health treatment was not needed or required by the participation decree. We acknowledge that the juvenile court's participation decree did not mandate that Mother obtain mental health treatment. Nevertheless, Williams referred Mother to a therapist and believed treatment was necessary for reunification. Further, Mother herself implicitly acknowledged that she needed treatment as she was planning to start treatment a week after the hearing. Finally, even assuming, arguendo, that juvenile court erred in its findings regarding Mother's mental health, the court's findings that she had failed to obtain a stable income or adequate housing is sufficient to support its determination that there was a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside Mother's care would not be remedied. *See A.F.*, 762 N.E.2d at 1251 (erroneous findings in decision to terminate parental rights will not prove fatal if there exists valid other findings that support trial court's conclusions).

12

## II. Best Interests

We next consider Mother's assertion that the State failed to prove termination is in the children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* We have previously held that the recommendations of the case manager and child advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

In determining that termination was in the best interests of the children, the court concluded, "Termination, providing for a subsequent adoption, would provide [the children] with permanency in a safe and stable environment where their needs will be met. [Mother] cannot provide the children with permanency." *Appellant's App.* at 37.

Mother challenges this conclusion, arguing that there was no evidence that she could not provide the children with permanency. First, she claims that she had sufficient monetary support and found a shelter that accommodates women with children. We have already concluded that there was clear and convincing evidence regarding income, housing, and mental health supporting the court's determination that the conditions resulting in removal would not be remedied. In addition, the court found that "[f]amily

13

case manager Karen Williams believes adoption is in the children's best interests because of the need for permanency, and [Mother] being unsuccessful in services." *Id.* The court also found that "[t]he children's Guardian ad Litem agrees with the plan of adoption." *Id.* These findings, in addition to the determination that the conditions resulting in removal would not be remedied, are by themselves sufficient to support the conclusion that termination was in the children's best interests. *See J.S.*, 906 N.E.2d at 236.

Second, Mother claims that the fact that the children were doing well in their foster home does not lead to the conclusion that they would not do well in her own care. The juvenile court found that the children were "bonded" and "doing well" in their foster home, that "[t]heir needs are being met," and that B.T. and C.K. "are making great grades." *Appellant's App.* at 37. The court also noted that the home was preadoptive as to C.K. and D.K., possibly preadoptive as to B.T., and that in any event B.T. was an adoptable child. *Id.*

However, these were not the only findings supporting the court's conclusion that termination was in the children's best interests. The court noted that "the same issues from the beginning were present" at the time home-based counseling with Bridwell ended in December 2010. *Id.* at 35. The court further noted that Mother's referral for home-based therapy was closed out after a month "due to lack of contact by [Mother]." *Id.* at 35-36. Regarding visitation, the court found, "[Mother] moved to Georgia in October 2011. She has not had visits with the children since that time and her visits were inconsistent during the CHINS proceedings, resulting in having them suspended." *Id.* at 36. From the time the children were removed in August 2009 through the time of the

14

termination hearing in January 2012, Mother failed to demonstrate even a semblance of stability such that DCS or her service providers could recommend reunification. She did not obtain a stable source of income or adequate housing, failed to follow through with mental health treatment or complete home-based counseling, and only sporadically visited the children.

Mother nonetheless cites *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), where our Supreme Court reversed the termination of parental rights. In that case, there was no evidence showing that permanency through adoption would be beneficial to the child or that remaining in foster care until he could be reunited with his incarcerated mother would be harmful to him. *Id.* at 1256. *G.Y.*, however, is distinguishable. There, the mother made positive steps in completing the required services available to her in prison, demonstrated commitment and interest in maintaining a parental relationship with the child, and showed willingness to continue parenting and other personal improvement programs after her release. Here, Mother has failed to show the necessary dedication to her children or any progress in providing them with a safe and stable environment.

We will reverse a termination of parental rights only upon a showing of clear error, that is, that which leaves us with a definite and firm conviction that a mistake has been made. *In re L.B.*, 889 N.E.2d 326, 342 (Ind. Ct. App. 2008). We find no such error here.

Affirmed.

NAJAM, J., and MAY, J., concur.